# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

JEROME E. TODD, also known as
Rome also known as JT,
            *Defendant-Appellant.*

No. 08-30360

D.C. No.
2:07-cr-00395-JLR-
1

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
August 5, 2009—Seattle, Washington

Filed October 20, 2009

Before: Harry Pregerson, John T. Noonan and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Noonan

14639

**COUNSEL**

Suzanne Lee Elliott, Esq., Seattle, Washington, for the defendant-appellant.

Ye-Ting Woo, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

**OPINION**

NOONAN, Circuit Judge:

Jerome Eugene Todd appeals his conviction of three counts of sex trafficking in violation of 18 U.S.C. § 1591(a)(1) and one count of conspiracy to engage in sex trafficking in violation of 18 U.S.C. § 371.

The sex trafficking statute, captioned the Trafficking Victim's Protection Act (TVPA), is a new effort to deal with a social ill whose international as well as interstate dimensions have invited federal attention and action. The TVPA was enacted in December 2000 and amended, as relevant here, in December 2003, July 2006 and December 2008. The statute focuses on those (usually men) who make money out of selling the sexual services of human beings (usually women) they control and treat as their profit-producing property.

FACTS

We state the facts as to Todd's treatment of four women:

*Todd and Kelsey Kirschman.* Just eighteen in January 2005, Kelsey was still in high school in Bellingham. Todd was not working but had cash. They dated, going to dinner and to the movies. In May 2006, Todd suggested they get a place together. He also told her that they could get rich together if she worked as a prostitute. He would advertise her in the *Seattle Weekly*. She agreed. He ran the ad with a picture of her, offering "full service" for $200. Calls came in from men, and she responded to them. She gave up a job at Fred Meyer because Todd wanted her available for prostitution 24/7. Todd also arranged for her services to be posted on *Craigslist*. At Todd's direction, she also "walked the track," that is, she hung out in an area frequented by prostitutes and potential customers. Todd laid down rules for her to obey. As she testified, "You had to, basically, do everything he wanted." Most

basically, "You had to give him all the money." Todd allotted Kelsey $35 each day to pay for condoms, food, and gas.

Todd maintained his rules psychologically by making Kelsey feel that she was "nothing." He maintained his rules physically by beating her "from head to toe," blacking one of her eyes and chipping one of her teeth. When she was 2½ months pregnant, he demanded that she abort the child, and she complied. She tried to hide some of her earnings as a prostitute from Todd, but he found them and confiscated them. She did not leave him because she thought that she "had nowhere else to go," was "scared," and had lived "under this man's rules" for a year and a half.

Reduced to this state of dependence, Kelsey performed a number of acts by agreement with Todd to further his traffic in the bodies of other women. She "groomed" Whitney T. — that is, coached her — as to how she should conduct herself as a prostitute working for Todd. She placed ads in *Craigslist* and *Seattle Weekly* advertising the sexual availability of Whitney and two other women who came to work for Todd as prostitutes. She rented hotel rooms for these women to use with customers, provided them with cellphones to receive calls from customers, and purchased condoms for them to supply to customers. In these actions, she collaborated with Todd.

*Todd and Whitney T.* Whitney T., aged twenty, met Todd at a party in October 2006. Whitney was the unmarried mother of a young child. She was unemployed and living with a girlfriend in Everett. She and Todd liked each other and began a relationship. Todd had no job but he wore nice clothes and had cash. Whitney learned eventually that his income came from Kelsey's work as a prostitute.

In January 2007, Todd told Whitney that if she too worked as a prostitute for a couple of years she could have nice cars and a nice house. In February 2007, Whitney went on her first

call. She moved into an apartment with Todd and Kelsey. Todd advertised her services on *Craigslist* and the *Seattle Weekly*. Todd imposed the rules that Whitney earn $500 in a day and that she turn the money over to him. She believed that Todd would beat her if she held any money back. She saw Todd beat Kelsey for violating one of his rules and was herself beaten by him for breaking his rule against speaking to black pimps.

Whitney T. twice left Todd and twice voluntarily returned to him. On July 3, 2007, she left him for good. She continued to work as a prostitute on her own.

*Todd and Whitney E.* Todd met Whitney E., aged eighteen, in June 2007. She had dropped out of high school, had left her father's home and her mother's home, was using drugs, was living with a boyfriend, and had been working for a week as a prostitute. The day after she met Todd, her boyfriend suggested that she work for Todd. The next day she began to work for him as a prostitute. He gave her a cellphone and clothes from Wal-mart. He advertised her on *Craigslist*. He told her that he expected her to service five customers per day and earn at least $900. He put her in an apartment with a prostitute who worked for his cousin, Trent. Trent told her he would enforce Todd's rules physically. In July 2007, Todd himself assaulted her when she questioned one of his rules. She telephoned her mother for help and later the same day left the apartment with her mother and reported the assault to the police.

*Todd and Jemelle L.* Todd met Jemelle on her twentieth birthday in July 2007. She was living with her mother and working as a caregiver. They began to date. Todd had no job but had cash. In October 2007, she leased a house, and she and Todd moved in together.

Jemelle had previously engaged in four or five acts of prostitution. Todd now told her it would be an easy way to make

money and have nice things. Todd gave her a phone to take calls from customers, and she began to respond to them after initially protesting. Todd advertised her availability in the *Seattle Weekly* and on the internet without her knowledge or consent. Todd told her that his rule was that she provide "full service," charge $200 per customer, report the transaction by telephone and turn all the money over to him. He provided her with marijuana.

Jemelle was scared seeing Todd beat Kelsey, and she was scared by his threat that she would regret it if she left him. Once she attempted to leave and he "pushed me down." The indictment covered the use of Jemelle from October 2007 to November 2007.

## PROCEDURE

On November 21, 2007, Todd was indicted. On February 8, 2008, a superseding indictment was returned. Trial began May 12, 2008. After seven days, the jury found Todd guilty on all counts. Both before and after the verdict Todd moved for a judgment of acquittal.

On September 29, 2008, Todd was sentenced to five years imprisonment for conspiracy to violate the TVPA; to 26 years to run concurrently on each of the TVPA counts involving respectively Whitney T., Whitney E., and Jemelle; and to ten years on the count of transporting a prostitute in interstate commerce.

Todd does not appeal his conviction or sentence on the count of transportation of a prostitute. He appeals his conviction on all of the other counts.

## ANALYSIS

*The Statute*.

**Sex trafficking of children or by force, fraud, or coercion**

**(a)** Whoever knowingly—

**(1)** in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, or obtains by any means a person; or

**(2)** benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing that force, fraud, or coercion described in subsection (c)(2) will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

**(b)** The punishment for an offense under subsection (a) is—

**(1)** if the offense was effected by force, fraud, or coercion or if the person recruited, enticed, harbored, transported, provided, or obtained had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or

**(2)** if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, or obtained had attained the age of 14 years but had not attained the age of 18 years at the time of such

offense, by a fine under this title and imprisonment for not less than 10 years or for life.

**(c)** In this section:

**(1)** The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

**(2)** The term "coercion" means—

**(A)** threats of serious harm to or physical restraint against any person;

**(B)** any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

**(C)** the abuse or threatened abuse of law or the legal process.

**(3)** The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.

18 U.S.C. § 1591.

We consider the statutory elements in turn.

*Effect on interstate or foreign commerce*. The TVPA was enacted after Congress took a substantial amount of evidence on the traffic in the sexual services of women by importing women from around the world by force or fraud. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464, 1466 (2000). Congress concluded that prostitution in American cities encouraged and

enlarged the market for this traffic from abroad. *Id.* Sex traffic is a global matter.

In addition to effect on foreign commerce, sex traffic in this case was conducted by advertising across state lines and so affected interstate commerce.

**[1]** The TVPA is unlike the Violence Against Women Act of 1994, 42 U.S.C. § 13981, which sought to protect women by making gender-motivated crimes of violence actionable and was found to be beyond the power of Congress because its subject matter was not commerce. *United States v. Morrison*, 529 U.S. 598 (2000). The TVPA deals with commerce within the power of Congress to regulate. The defendant does not question the act's constitutionality.

**[2]** *Todd's knowledge*. Here is a crux. Could Todd have known when he soft-soaked Whitney T., Whitney E., and Jamelle L. to go to work for him that later "force, fraud, or coercion would be used" to cause each of them to engage in commercial sex? How does anyone "know" the future?

**[3]** What the statute means to describe, and does describe awkwardly, is a state of mind in which the knower is familiar with a pattern of conduct. If "to know" is taken in the sense of being sure of an established fact, no one "knows" his own or anyone else's future. As William Shakespeare said in Sonnet 115 of time, its "million'd accidents creep in" and nothing is completely stable, no plan is beyond alteration. When an act of Congress requires knowledge of a future action, it does not require knowledge in the sense of certainty as to a future act. What the statute requires is that the defendant know in the sense of being aware of an established modus operandi that will in the future coerce a prostitute to engage in prostitution.

**[4]** The government's evidence showed that Todd had such awareness when he persuaded Whitney T. to work for him. He had an established practice of living off the earnings of a

prostitute, doing so by rules controlling her work and payment of the proceeds to him. The jury could conclude that Todd knew he would follow the same pattern with Whitney T. and then with Whitney E. and Jamelle L. Just as a mother who has had one child in school and prepared his lunch knows that she will prepare the school lunch for her second child, just as a judge knows that his law clerks will use Westlaw, so Jerome Todd knew that he would use coercion to cause his sex workers to make money for him.

*The findings of the jury.* The jury was instructed:

> The defendant is charged with count 2 of the first superseding indictment with sex trafficking, in violation of Title 18, United States Code, Sections 1591(a)(1) and 1591(b)(1). In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:
>
> First, beginning in or about February 2007, and continuing through in or about July 2007, the defendant knowingly did recruit, entice, harbor, transport, provide, or obtain a person, that is, [Whitney T.];
>
> Second, the defendant did so knowing that force, fraud, or coercion would be used to cause [Whitney T]. to engage in a commercial sex act; and
>
> Third, the defendant's actions were in or affecting interstate commerce.

**[5]** The jury answered these questions affirmatively as to Whitney T. and answered the same questions affirmatively as to Whitney E. and Jamelle L. The evidence of Todd's knowledge of his own modus operandi in securing an income from prostitution by a pattern of coercion was sufficient to support the jury's verdict.

**[6]** *The sentence.* The statute provides punishment of imprisonment of fifteen years to life if "the offense was effected by fraud, force or coercion." 18 U.S.C. § 1591(b)(1). If the offense "was not so effected" and the victim was 14 to 18, imprisonment for ten years to life. *Id.* § (b)(2). The statute provides no punishment for acts not described in (a) or (b).

The Sentencing Guidelines do provide guidance to a sentence under § 1591 when no fraud, force or coercion have been found by the jury. U.S. SENTENCING GUIDELINES MANUAL § 2G1.1. The Guidelines, however, do not have the force of a statute. The Guidelines cannot recommend a penalty not provided by a statute. The hole in the statute cannot be filled by invoking the Guidelines.

The victims in this case were all over 18. The jury did not find that the offenses of which they were the victims were "effected by fraud, force or coercion," as required by § 1591(b)(1).

**[7]** No person may be subjected to imprisonment unless a jury finds the facts on which the imprisonment is justified. *United States v. Booker*, 543 U.S. 220, 236 (2005). Todd has been sentenced to three concurrent terms of imprisonment for 26 years. The facts justifying these sentences were not found by a jury.

In an earlier case in this circuit in which offenses under 18 U.S.C. § 1591(a)(1) were prosecuted, convictions obtained and sentences imposed, the jury instructions were similar to those given here. *United States v. Chang Liu*, 538 F.3d 1078 (9th Cir. 2008). The jury did not find fraud, force or coercion. *Id.* at 1085. The omission of such a finding was not raised by the parties nor noticed by the court affirming the judgment. *Id. Chang Liu* thus does not bind us: the issue was not raised nor decided. *See United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37-38 (1952) (prior decision is not binding

precedent on issue neither "raised in briefs or argument nor discussed in the opinion of the Court").

**[8]** On the other hand, the only other circuit to have addressed the force, fraud or coercion provision of § 1591, *United States v. Marcus*, 538 F.3d 97, 101-102 (2nd Cir. 2008) (per curiam) (vacating the conviction on ex post facto grounds), found sufficient evidence to convict where the question of the defendant's use of fraud, force or coercion had been submitted to the jury. *See United States v. Marcus*, 487 F. Supp. 2d 289, 308 (E.D.N.Y. 2007) ("As the court instructed the jury, the government was required to prove . . . the defendant knowingly used force, fraud or coercion to cause the trafficked individual to engage in a commercial sex act."). This example illustrates the present problem.

Todd has not raised an argument under the Sixth Amendment. His challenge to the sufficiency overlooks completely the absence of jury findings to support of the sentence. The omission was not obvious to the parties or the district judge. Once noted, however, the omission is now obvious to all. It is fatal to "the fairness, integrity [and] public reputation of judicial proceedings." *Silber v. United States*, 370 U.S. 717, 718 (1967) (stating the grounds on which an appellate court may, sua sponte, notice error) (internal quotation marks omitted).

**[9]** " 'The right to have a jury make the ultimate determination has an impressive pedigree. Blackstone described 'trial by jury' as requiring that '*the truth of every accusation*, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbors . . . . ' 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (emphasis added)." *United States v. Gaudin*, 515 U.S. 506, 510-11 (1995). Imposed without the proper jury findings, Todd's sentences under counts 2, 3 and 5 cannot stand.

**[10]** Todd was also convicted of conspiracy to engage in sex trafficking in violation of 18 U.S.C. § 371 and sentenced to five years imprisonment, and he was convicted of transporting a prostitute in interstate commerce in violation of 18 U.S.C. § 2421 and sentenced to ten years imprisonment. The sentences are currently concurrent. Todd appeals his conviction for conspiracy, but not his conviction for transporting a prostitute. Todd's conviction for conspiracy is a different case from his conviction for sex trafficking. Sufficient evidence was presented to show that he entered into agreement with Kirschman to further a practice of sex trafficking, and the jury found the necessary facts.

**[11]** Nevertheless, recognizing that the sentencing of multiple crimes often takes into account the sentencing package as a whole, we think it advisable to vacate Todd's sentences for conspiracy and for transporting a prostitute so that the district court may be free to consider its resentencing options. Although we are also vacating Todd's sentence for sex trafficking, the district court is free to consider his conviction under 18 U.S.C. § 1591(a) in considering enhancements to the sentences under § 371 and § 2421.

Todd's convictions are AFFIRMED. However, Todd's sentences under counts 1-5 are VACATED, and this matter is REMANDED for further proceedings in accordance with this opinion.